**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARGARETTE J. CARVER, | ) | CASE NO. 3:20-cv-00051 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Margarette Carver, ("Plaintiff" or "Carver"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

On September 25, 2014, Carver filed an application for POD, DIB, and SSI, alleging a disability onset date of April 9, 2003 and claiming she was disabled due to back injury, total blindness in her left eye, depression, diabetes, high blood pressure, anxiety, and panic attacks. (Transcript ("Tr.") at 78.)  The applications were denied initially and upon reconsideration, and Carver requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 184-186.)

On January 16, 2019, an ALJ held a hearing, during which Carver, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 35-75.)  On January 16, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id*. at 12-34.)  The ALJ's decision became final on November 21, 2019, when the Appeals Council declined further review.  (*Id*. at 1-6.)

On January 10, 2020, Carver filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14, 15.)  Carver asserts the following assignments of error:

(1)     The ALJ erred when she failed to properly evaluate the cumulative evidence in the record.

(2)     The ALJ's determination regarding credibility was erroneous and was not supported by substantial evidence in violation of Social Security Ruling 16-3p.

(3)     The ALJ erred when she did not meet her burden at Step Five of the Sequential Evaluation.

(Doc. No. 1 at 1.)

# II.  EVIDENCE

## A.     Personal and Vocational Evidence

Carver was born in June 1971 and was a "younger" person under social security regulations

2

at all relevant times.  (Tr. 43.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has some college education and is able to communicate in English.  (*Id.*)  She has past relevant work as a checker and meat counter clerk.  (*Id*. at 67.)

## B.    Relevant Medical Evidence[2]

### 1.    Mental Impairments

On March 26, 2011, Carver sought emergency treatment for an episode of depression, including suicidal feelings, linked to stress and anxiety related to her Worker's Compensation claim. (*Id*. at 657-58, 660.)  She did not have any previous suicide attempts and did not have any plan of suicide.  (*Id*. )  Carver's mental status exam reflected that her appearance, speech, behavior, thought process, and thought content were normal but her mood was depressed, her affect was blunted and her psychomotor responses were mildly slowed.  (*Id*. at 662.)  She was alert and oriented and did not have current suicidal ideation.  (*Id*. at 663.)  She was admitted to the hospital by psychiatrist Gregory Bishop, M.D., and started on Zoloft.  (*Id*. at  663.)  She was discharged on March 30, 2011, with instructions to see Dr. Bishop on April 11.  (*Id*. at 657.)

On November 28, 2011, she reported to Dr. Bishop that she was sometimes angry and frustrated with the Worker's Compensation system, but "generally speaking she is not depressed." (*Id*. at 439.)  He diagnosed major depressive disorder and panic disorder, and continued prescriptions for Zoloft, doxepin, and Vistaril for anxiety as needed.  (*Id*.)

On May 14, 2012, Carver told Dr. Bishop that she was "doing very well," but occasionally she had some anxiety and depression.  (*Id*. at 436.)  Dr. Bishop observed "she seems to be bouncing

---

[2]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

back from her stresses better," and noted her sleep had been "adequate," and her grooming was "good."  (*Id.*)

On July 9, 2012, she told Dr. Bishop that she was stressed about her Worker's Compensation case, but her moods had "largely been stable," and she was using medication when she became anxious.  (*Id.* at 435.)

On October 29, 2012, her husband accompanied her to her appointment with Dr. Bishop.  (*Id.* at 434.)  She reported still "doing very well," with increased motivation and energy levels, and "only one or two panic attacks."  (*Id.*)  Pain was affecting her sleep pattern.  (*Id.*)  She rarely used her anxiety medication.  (*Id.*)

On April 29, 2013, she reported to Dr. Bishop that her moods had been "fairly good," but she became anxious when she was under stress, such as giving a deposition in her Worker's Compensation case.  (*Id.* at 432.)  She reported sleeping about eight hours at night.  (*Id.*)

On September 6, 2013, she reported to Dr. Bishop that "she has been doing well with minimal anxiety" and "no significant depression."  (*Id.* at 431.)

On November 1, 2013, she reported to Dr. Bishop that she was "doing well,' except for anxiety and depression related to her Worker's Compensation case.  (*Id.* at 429.)  She reported "taking care of things at home while her husband is in school."  (*Id.*)

On September 5, 2014, she reported to Dr. Bishop that she did not have any significant depression or anxiety unless she had to deal with her Worker's Compensation case.  (*Id.* at 422.)  She was diagnosed with major depressive disorder, recurrent, and panic disorder complicated by psychosocial stressors and comorbid medical illness.  (*Id.*)  Dr. Bishop continued her prescriptions for Zoloft, doxepin, and Vistaril (Id.).

4

On November 14, 2014, Carver completed a function report. (*Id*. at 305-12.) She reported needing reminders to take her medications. (*Id*. at 307.) She also stated that she did not handle stress well and had anxiety attacks. (*Id*. at 311.)

On February 27, 2015, Carver reported to Dr. Bishop that her depression and anxiety had been relatively well managed. (*Id*. at 512.) Dr. Bishop assessed her with major depressive disorder recurrent and panic disorder with agoraphobia complicated by psychosocial stressors and comorbid medical illness. (*Id*.)

On May 22, 2015, Carver reported that she had completed physical therapy without benefit and was waiting to see Dr. Zaky. (*Id*. at 517.) Dr. Bishop updated her diagnoses to major depressive disorder recurrent, anxiety disorder, ruled out panic disorder, and ruled out PTSD. (*Id*.)

On August 14, 2015, Carver reported that she was troubled by her back pain and her physical activity was limited. (*Id*. at 594.) Dr. Bishop noted that her affect was mildly anxious and minimally depressed. (*Id*.)

On August 23, 2018, Carver's husband completed a function report, stating that she would break down in tears, had frequent panic attacks, and "doesn't like crowds." (*Id*. at 377.) He explained "this injury has affected her mentally it has made her feel like she can't do much." (*Id*. at 379.)

### 2.       Physical Impairments

On June 12, 2006, Carver had a left L5 laminotomy and discectomy for a herniated left L5 disc. (*Id*. at 527.) She was described as "markedly overweight at 230 pounds and only 5 feet 3 inches tall." (*Id*.)

The surgery failed to resolve her pain, and she sought care for low back pain in the emergency

5

room on June 20, 2008, June 22, 2008, and December 31, 2009.  (*Id*. at 669, 667, 665.)

On June 16, 2010, Carver had a second surgery for her degenerated L4 and L5 discs, and post lumbar laminectomy state.  (*Id*. at 531.)  She underwent an anterior L4 and L5 discectomies, interbody fusion with bank bones and application of two anterior spine plates.  (*Id*.)  She was described as "markedly overweight."  (*Id*.)

On March 27, 2013, Carver established treatment with Nurse Practitioner Rebecca Nelson at Firelands Physicians Group.  (*Id*. at 454.)  During the examination, she complained of back pain, pain with movement, and shooting leg pain in her left leg. (*Id*.)  On examination, she had limited range of motion in her left side, but had full muscle strength in her arms and legs, though pain in her left leg with movement and some muscle tightness in her left lumbar area.  (*Id*. at 454-55.) Nurse Nelson diagnosed diabetes mellitus without complication, dyslipidemia, back pain, hypertension, and major depressive disorder recurrent severe.  (*Id*. at 455.)

On June 10, 2014, Carver had an employability assessment by Joseph Cannelongo, MS, CRC. (*Id*. at 352-358.)  The assessment noted that she had attempted to return to work in 2007 on a part time basis, but an exacerbation of her symptoms occurred, and she stopped working on June 20, 2008. (*Id*. at 353.) In addition to her work-related conditions, Cannelongo identified barriers to work that included anxiety with panic attacks, suicidal ideation, left eye blindness, severe exogenous obesity, left wrist fracture, hypertension, and diabetes. (*Id*.)  According to the report, there had been multiple independent medical examinations, with Dr. Elizabeth Mease limiting her to work at the sedentary level of exertion on a part-time basis, Dr. Thomas Lieser finding her capable of lifting twenty pounds continuously, Dr. Paul Eby opining she could perform sedentary work, and Dr. John

Heilman stating that she was a candidate for permanent total disability.[3]  (*Id*. at 353-354.) Cannelongo opined that Carver's impairments "render her unable to be employed in any capacity for which she is otherwise qualified by education, training, and/or experience." (*Id*. at 358.)

In July 2014, Carver returned to Nurse Nelson and reported she was in good health including improved blood sugar levels. (*Id*. at 457.) Her physical exam showed she was in no acute distress, her gait was normal and unassisted, and she had full muscle strength in her arms and legs. (*Id*. at 458.)

On November 3, 2014, Opthamologist Dr. Harris Schild also completed a questionnaire for the State Agency, describing Carver as blind in her left eye as a result of  a congenital corneal scar. (*Id*. at 410).  He opined that her right eye had normal visual function for work, though she should not be in hazardous environments. (*Id*. at 411.)  He did not indicate any limitations related to her depth perception.

On  November 14, 2014, Carver completed a function report. (*Id*. at 305-312).  She reported that she had a left lower spinal cord injury with a L4-L5-S1 fusion, and she was blind in her left eye, and could not turn to her left side. (*Id*. at 305.)  She was able to sit in a chair for less than five minutes, could not stand on her left foot or leg, and could walk less than five minutes.  (*Id*.)  She laid down most of the time due to severe pain. (*Id*. at 306.) They put a bed in her dining room with a rail to help her get out of bed.  (*Id*.)  She could not lift more than five pounds.  (*Id*.)  She relied on her husband to put on her bra, help her shampoo and dry her hair, and "wipe my butt most of the time." (*Id*.)  She was unable to stand at the stove to cook and was limited in her cleaning due to an inability

---

[3]  None of these medical opinions, which were apparently gathered in support of her Worker's Compensation claim, are in the record for this case.

to bend, squat, lift, or twist. (*Id*. at 307.) She used an electrical wheel chair when shopping. (*Id*. at 308.) She watched television a lot as she could lay down but was limited in other activities she used to enjoy, like cooking, puzzle books, and scrap books, due to her severe back pain. (*Id*. at 309.) She noted that her doctor called her back fusion failed as she had a lot of severe pain. (*Id*. at 312.)

On January 6, 2015, Carver sought care for low back pain at the emergency room, after a visit to the chiropractor caused back spasms. (*Id*. at 654, 478.) She stated that she could not stand up, but the physician noted that she transferred from a wheelchair to the bed independently. (*Id.* at 653.) Examination notes describe her as "moving slowly" due to low back pain with movement of her legs and her lumbar spine was tender to palpation. (*Id*. at 655.) Carver was given a narcotic pain medication in the hospital and a short-term taper prescription for a steroid, muscle relaxer, and different narcotic pain reliever. (*Id*.)

On January 7, 2015, Carver followed-up with Nurse Nelson. (*Id*. at 474.) On exam, she was in no acute distress, but was unable to stand erect and was using a walker for assistance. (*Id*. at 474-75).

On January 13, 2015, Carver sought treatment from Dr. Christopher Parnell for severe low back pain that had persisted for more than two weeks. (*Id*. at 476.) Examination notes report Carver's range of motion in her lumbar spine was limited secondary to pain. (*Id*. at 477.) Dr. Parnell assessed an acute exacerbation of chronic back pain, and medical notes indicated she was referred for a CT myleogram and physical therapy, and her case would be "discussed at the next spine center meeting." (*Id*. at 476.)

On February 4, 2015, Dr. Sherif Zaky examined Carver. (*Id*. at 478-81.) Dr. Zaky noted that the lumbar myelogram from January 2015 demonstrated status post anterior spinal fusion at L4/5

8

and L5/S1 with mild anterior indentation of the thecal sac at L4/5, slight anterior indentation of the thecal sac at L1/2 and L3/4, and a mild broad based annular bulging at L3/4 with mild broad based posterior disco-osteophytosis at L1/2.  (*Id*. at 478; 485-87.)  Dr Zaky observed that her gait was antalgic, she had significant tenderness on palpation of the left lumbar paraspinal muscles and she had a positive straight leg raise on the left. (*Id*. at 479-80.) He diagnosed post laminectomy syndrome, degenerative disc disease, lumbar spondylosis, and sacroiliitis.  (*Id*.)

On March 4, 2015, Carver returned to Dr. Zaky for treatment of low back pain with radiation down the left lower extremity.  (*Id*. at 482.) He described her gait as "grossly normal," she had significant tenderness on palpation of the left lumbar paraspinal muscles, bilateral positive Faber test, and a positive straight leg raise on the left. (*Id*. at 483.)  Her motor exam was normal, and her reflexes were intact.  (*Id*.)

In March 2015, ophthalmological consultative examiner Dr. Schild opined that Carver could see to read and for distance with her right eye, and could pass an eye exam for daytime driving. (*Id*. at 493.)  He did not identify any limitations related to her depth perception.

In April 2015, Dr. John Heilman completed a questionnaire for the State Agency, opining that Carver had pain at the level of eight or nine over her sacrum and sacroiliac joint.  (*Id*. at 403.)  He also noted that the muscles in her lower extremities were weak, and although she responded well to treatment, her relief was temporary. (*Id*.)  He reported that treatment notes from 2011 described Carver as a victim of failed back surgery because she continued to have pain and considerable weakness in the lower back and left lower extremity. (*Id*. at 405.)

On June 1, 2015, Carver returned to see Dr. Zaky and her physical exam was generally unchanged, with "grossly normal" gait, but "significant" tenderness on palpation of bilateral lumbar

paraspinal muscles. (*Id*. at 756). The insurance company had denied the recommended epidural steroid injection and nerve blocks. (*Id*. at 754.) Dr. Zaky recommended continuing with medication management and prescribed a TENS unit. (*Id*. at 756.)

On September 28, 2015, Carver had a follow-up appointment with Dr. Zaky and her physical exam remained unchanged from her prior appointments. (*Id*. at 750.)  Dr. Zaky referred her to physical therapy, prescribed a compound cream for pain, and continued her medications. (*Id*. at 752.)

On January 10, 2017 and February 14, 2017, Carver had epidural steroid injections to treat her lumbar degenerative disc disease status post lumbar spine surgery and chronic pain. (*Id*. at 619, 622).

On March 8, 2018, Carver had a nerve block on the left for her lumbosacral spondylosis. (*Id*. at 617).  At her follow up appointment on March 19, 2018, she reported experiencing fifty to sixty percent pain release and increased function for two days.  (*Id*. at 714.)

On April 10, 2018, Dr. Zaky completed another injection for her left sacroiliitis, lumbosacral spondylosis, and chronic pain. (*Id*. at 615.) At her follow-up appointment, on April 17, 2018, Carver reported 50 to 60 percent relief and increase in functioning for two days following the procedure. (*Id*. at 714.)  Her physical exam was unchanged from her prior appointment. (*Id*. at 715.)

On May 22, 2018, Carver returned to Dr. Zaky and her physical exam was unchanged. (*Id*. at 712.) She rated her pain as ten on the scale of one to ten. (*Id*.) Dr. Zaky continued her pain medication, which she reported using sparingly and had not been refilled since January. (*Id*. at 713.)

Carver cancelled her caudal epidural steroid injection in June, as "she wanted to wait." (*Id*. at 710, 777.)

On July 12, 2018, Carver told Dr. Zaky she continued to experience low back pain at an

10

intensity of 8/10 with radiation to the left lower extremity. (*Id*. at 710.) He attributed this to post-laminectomy syndrome (*Id*. at 711.)

On August 8, 2018, Carver reported to Dr. Zaky that the post caudal epidural steroid injection under floriscopic guidance that she had received earlier that month had reduced her pain by 80-90% and left her with only "mild" low back pain, which she rated 2/10 in intensity. (*Id*. at 775.) Dr. Zaky noted "she is overall doing very well and does not require any further treatment at this time." (*Id*. at 776.)

On August 23, 2018, Carver's husband completed a function report. (*Id*. at 370-79.) He reported Carver was unable to sit or stand for any length of time without pain. (*Id*. at 370.) She needed to use electric carts when shopping. (*Id*. at 373.) She could only lift five pounds and had problems walking, sitting, or standing. (*Id*. at 376.) He reported that their dining room was now her bedroom so when she needed to lay down, she could do so quickly. (*Id*. at 379.)

## C.    State Agency Reports

### 1.    Mental Impairments

On initial review, no more than mild limitations were provided for Carver's psychological impairments. (*Id*. at 87.)

On September 2, 2015, state agency reviewing psychologist Cindy Matyi, PhD, evaluated the record and opined that Carver had depression and anxiety, which caused moderate limitations in the following mental abilities:

- maintaining attention and concentration for extended periods,

- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms;

11

- perform at a consistent pace without an unreasonable number and length or rest periods;

- interact appropriately with the general public;

- accept instructions and respond appropriately to criticism from supervisors; and

- ability to respond appropriately to changes in the work setting.

(*Id*. at 123-24.)

### 2.    Physical Impairments

On April 13, 2015, State Agency reviewing physician Leigh Thomas, M.D., opined that Carver could perform light work, with the following limitations:

- standing and walking only two hours in an eight-hour workday;

- frequently climbing ramps and stairs;

- occasionally climbing ladders, ropes, or scaffolds; and

- no jobs requiring binocular vison or exposure to hazards due to her lack of vision in her left eye.

(*Id*. at 89-91.)

On September 3, 2015, State Agency reviewing physician Dr. William Bolz affirmed this opinion with the exception of finding that Carver was able to stand and walk for four hours, rather than two hours, in an eight-hour day. (*Id*. at 122-23.)

### D.    Hearing Testimony

During the September 14, 2018 hearing, Carver testified to the following:

- She was born in 1971, and currently lives with her husband in Sandusky.  They have no children.  Her husband works part time.  (*Id*. at 43.)

- She receives food stamps and Medicaid.  (*Id*. at 44.)

12

- From 2003 until 2014 she had no health insurance.  (*Id*.)

- She has a valid driver's license and drives once or twice a week, for a distance of no more than five miles.  Her mother drove her to the hearing.  (*Id*.)

- She has associates degrees in business management and marketing.  (*Id*. at 45.)

- She last worked at Myer [sic] in 2008.  She had worked there since 1998, in the meat department and the gas station.  (*Id*.)

- They gave the job greeting people at the gas pumps when she returned from disability, because it was light duty.  They didn't usually have a worker in that role.  She found it difficult because it required a lot of walking.  (*Id*. at 46.)

- She first injured her back in 2003, but didn't have surgery until 2006.  Before surgery, she attempted to treat her back with water aerobics and "back shots."  (*Id*. at 48-49.)

- After her recovery from the 2006 surgery, she returned to work at Myer [sic] in the gas station attendant role.  She worked four hour shifts for twelve weeks, alternating between sitting, standing and walking.  (*Id*. at 49.)

- She was having trouble sitting at the hearing because of back and leg pain.  (*Id*. at 50.)

- She had a second back surgery in 2010.  No further surgery has been recommended. Currently, she gets "back shots" to treat her pain whenever insurance approves them.  (*Id*. at 51.)

- Her pain never goes away.  She says it is usually a 10, but she doesn't go to the hospital because "[t]hey can't do anything for me . . . . so I just lay down and deal with it, take my medicine."  (*Id*. at 52.)

- Sitting, standing and walking make her pain worse.  She is most comfortable lying down on her right side.  (*Id*.)

- She spends most of the day lying on a bed in her dining room, because she finds climbing stairs "too painful."  She watches television and sleeps when she is able. (*Id*. at 53.)

- She wakes about every two hours at night.  She takes doxepin to help her sleep.  (*Id*. at 53-54.)

13

- She tests her blood sugar in the morning and then once or twice more during the day.  She feels her diabetes is well controlled now, although it was not earlier.  (*Id.* at 54-55.)

- She feels her blood pressure is also well controlled.  (*Id.* at 55.)

- Her longtime psychiatrist recently moved and she has not yet begun care with her new doctor.  Until recently, she felt her depression was well-controlled, but recently she experienced "depression for about a week."  (*Id.* at 57.)

- Counseling has been hard to maintain because the counselors don't stay very long.  She has a case manager who helps her with medication and access to government programs.  (*Id.* at 57-58.)

- She experiences panic attacks about ten times a month.  They "can come at the weirdest times," without any warning.  Her heart starts beating fast, she starts crying and gets upset.  They usually last about half an hour.  (*Id.* at 58-59.)

- Unloading the dishwasher often triggers a panic attack.  It is also physically hard for her, because it requires bending, reaching and gripping things.  (*Id.* at 59.)

- She needs help showering, dressing, and getting up from the toilet.  (*Id.* at 60.)

- She shops with her husband, but has to wait - sometimes for over an hour - for a motorized cart to be available because she can't walk for more than a couple of minutes.  (*Id.*)

- Because she is blind in her left eye, she has to turn her body all the way to the left to see things on her left side.  This makes driving hard.  She also has no depth perception.  (*Id.* at 62.)

The VE testified Carver had past work as a checker and a meat counter clerk.  (*Id.* at 67.)  The ALJ then posed the following hypothetical question:

I would like you to assume an individual of the claimant's age, education and vocational background with the ability to perform a full range of work at the light exertional level, except standing and walking is limited to a total of four hours in an eight-hour workday, frequently climb ramps and stairs, occasionally climb ladders, ropes or scaffolds. No jobs requiring binocular vision. The individual must avoid hazards such as dangerous machinery and unprotected heights. The individual is capable of understanding, remembering and carrying out simple tasks that are not fast paced.

14

Meaning the pace of productivity is not dictated by an external source of which the individual has no control. The individual can tolerate frequent interaction with coworkers, supervisors and the public, but should have no responsibility for conflict resolution or persuading others. Finally, the work routine should be repetitive from day-to-day with few and expected changes. Would such an individual be capable of performing any of the claimant's past work?

(*Id*. at 67-68.)

The VE testified the hypothetical individual would not be able to perform Carver's past work as a checker or meat counter clerk.  (*Id*. at 68.)  The VE  further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as general office helper, sorter, or assembler.  (*Id*.)

Next, the ALJ amended the hypothetical, adding the limitations that the person could only stand and walk two hours a day, occasionally climb ramps and stairs, no climbing of ladders, ropes or scaffolds, and occasional balancing, stooping, kneeling, crouching, and crawling.  (*Id*. at 68-69.) The VE testified that the number of sorter and assembler job would be reduced, and the person could also perform a reduced number of inspector packer jobs. (*Id*. at 69.)

The ALJ's third hypothetical added the limitations that the person could only lift and carry ten pounds occasionally, which would reduce the RFC to sedentary.  (*Id*.)  The VE indicated that such a person could perform jobs at the sedentary level of exertion, such as sedentary inspector, assembler, or information clerk.  (*Id*. at 69-70.)

The ALJ's fourth hypothetical added the limitation that the person needed to stand one to two minutes approximately every fifteen minutes.  (*Id*. at 70.)  The VE opined that, if the hypothetical person was standing for one to two minutes in the vicinity of their workstation, it would not be problematic and would not preclude employment.  (*Id*.)

15

The VE also testified that the customary tolerance for being off task is fifteen percent and employers will allow one absence per month after the probationary period, which would include coming in late or leaving early.  (*Id*. at 70.)  The VE also opined that, if "variable pace" meant that a person is only producing eighty percent of what the average worker is producing, it "would be problematic, and most likely result in termination." (*Id*. at 73.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 & 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant

must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Carver was insured on her alleged disability onset date, April 9, 2003, and remains insured through March 31, 2010, her date last insured ("DLI.")  (Tr. 17.)  Therefore, in order to be entitled to POD and DIB, Carver must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.        The claimant meets the insured status requirements of the Social Security Act

through March 31, 2010.

2.    The claimant has not engaged in substantial gainful activity since April 9, 2003, the alleged onset date.

3.    The claimant has the following severe impairments: left eye congenital microphthalmos, corneal scar; obesity; diabetes mellitus; lumbar degenerative disc disease / post laminectomy syndrome; major depressive disorder; and panic disorder.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: requires the ability to stand within the vicinity of the workstation for one to two minutes approximately once every 15 minutes; occasionally climb ramps/stairs; never climb ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; no jobs requiring binocular vision; avoid hazards such as dangerous machinery and unprotected heights; capable of understanding, remembering, and carrying out simple tasks that are not fast paced meaning the pace of productivity is not dictated by an external source over which the individual has no control; the individual can tolerate frequent interaction with coworkers, supervisors, and the public; but should have no responsibility for conflict resolution or persuading others; and the work routine should be repetitive from day to day with few and expected changes.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born on June **, 1971, and was 31 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date.

8.    The claimant has at least a high school education, and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a Framework supports a finding the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10.   Considering the claimant's age, education, work experience, and residual

18

functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 9, 2003, through the date of this decision.

(Tr. 17-27) (internal citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, ,424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388,

19

389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      First Assignment of Error: Evaluation of the Cumulative Record Evidence**

Carver asserts that the ALJ failed to adequately support her conclusion that Carver could perform substantial gainful activity that existed in the national economy.[4]  (Doc. No. 12 at 15.)  Specifically, she asserts that the ALJ failed to properly evaluate the combination of Carver's impairments in conjunction with her obesity and diabetes, and did not properly weigh the opinion of vocational expert Joseph Cannelongo or the psychiatric restrictions recommended by the state agency reviewing psychologist. (*Id*. at 16-19.)

Respondent asserts that the ALJ met her burden through "sound consideration of the relevant objective medical evidence, the medical opinions, and analysis of Plaintiff's subjective symptoms," and specifically indicated that she considered the combined effects of Carver's impairments.  (Doc. No. 14 at 11-12.)  He points out that Carver failed to identify how further consideration of her obesity or diabetes would affect the ALJ's RFC finding.  (*Id*. at 11.)

**1.      The ALJ considered the record as a whole**

The ALJ is obligated to consider the record as a whole.  *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir.1985).  It is essential for meaningful appellate review that the ALJ articulate reasons for crediting or rejecting particular sources of evidence.  *Morris v. Sec'y of H.H.S.*, No.

---

[4]  To the extent that Carver is also attempting to make an argument that the combination of her impairments would meet or equal a listing, this is deemed waived. (Doc. No. 12 at 18-19). *See McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Carver fails even to identify the listing she believes she might have met or equaled. *Sullivan v. Zebley,* 110 S. Ct. 885, 891 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment.").

21

86 5875, 1988 WL 34109, at *2 (6th Cir. April 18, 1988). Otherwise, the reviewing court is unable to discern "if significant probative evidence was not credited or simply ignored." *Id*. (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981)). The ALJ need not provide a "written evaluation of every piece of testimony and evidence submitted. However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Id*. (quoting *Cotter*, 642 F.2d at 705). An ALJ "cannot 'pick and choose' only the evidence that supports his position." *Kester v. Astrue*, No. 3:07cv00423, 2009 WL 275438, at *9 (S.D. Ohio Feb. 3, 2009) (citing *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Switzer v. Heckler*, 742 F.2d 382, 385 86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 57 (S.D.N.Y. 2002)). However, an ALJ is not required to provide detailed evaluation of every piece of evidence contained within the record. Rather, the ALJ is charged with providing *minimal* articulation of their assessment of the evidence. *See Morris,* 1988 WL 34109, at *2.

Here, despite Carver's assertions to the contrary, there is no evidence that the ALJ "disregarded" evidence of Carver's physical impairments.[5] At Step Three, she recognized that left eye congenital microphthalmos, corneal scar; obesity; diabetes mellitus; lumbar degenerative disc disease / post laminectomy syndrome; major depressive disorder; and panic disorder were all severe impairments. (Tr. 18.) However, the ALJ cited evidence showing that Carver's diabetes was well-controlled, her gait was grossly normal,[6] she was capable of fine and gross motor manipulations, and

---

[5] Indeed, much of the evidence that Carver asserts the ALJ disregarded was specifically discussed in her decision, including Carver's two back surgeries, the results of her lumbar myelogram, and her back injections. (Tr. 22-24.)

[6] This is noted throughout the majority of the record. (Tr. 748, 752, 756.) Even when Carver was suffering pain at a reported 8/10 intensity, she was able to walk to the clinic from the hospital - an unspecified distance, but significant enough to be included in the

her back pain responded well to treatment, although relief was temporary.[7] (*Id*. at 24.)

Carver does not dispute the ALJ's conclusion that her only treatment between 2010 and 2015 were with her chiropractor and primary care physician.  (*Id*. at 22-23.)  The ALJ noted that the medical records from this period document that she consistently reported to her primary care provider that she was in good health, and generally felt good,[8] although at her initial appointment she discussed suffering from lower back pain. (*Id*. at 23; *see also* 454, 457-58, 460-62, 465.)  Similarly, her physical exams from this time revealed she was in no acute distress, had full muscle strength in her arms and legs, though with muscle tightness and pain with movement in her left leg, and her gait was normal and unassisted. (Tr. 455-57, 461-65, 471-72).  The records indicate that her pain worsened in December 2014, leading her to visit the ER, as the ALJ noted.  (*Id*. at 654.)  After that, as the ALJ discussed, Carver regularly sought care for back pain, which sometimes radiated into her left leg, often describing the intensity of her pain as nine or ten out of ten, although medical records described her as having no acute distress and no gait deficiency[9] or need for an assistive device. (Tr. 23-24, 52, 476-77, 478-79, 483, 499, 764.)  However, although she testified that her pain was usually at an intensity of 10/10, she acknowledged that she rarely seeks emergency treatment, instead

---

medical notes.  (*Id*. at 746.)

[7] For example, in February 2017, an epidural steroid injection provided 95% pain relief. (Tr. 732.)  In August 2018, a similar injection provided 80-90% pain relief.  (*Id*. at 776.) Other injection treatments provided less dramatic, but still significant levels of relief.  (*Id*. at 736.)

[8] At one appointment, she had a headache.  (Tr. 465.)  At another, she had a sore throat and cough.  (*Id*. at 463.)

[9] In February 2015, Dr. Zaky described Carver as having an antalgic gait.  (Tr. 479-80.) However, the following month Dr. Zaky described her gait as "grossly normal."  (Id. at 483.)

choosing to "just lay down and take my medicine."[10]  (*Id*. at 52.)

The ALJ's assessment of all of this evidence - including evidence from the period after the initial review and reconsideration stages - led her to give only "some weight" the earlier assessments of the State Agency reviewing physicians, and make a more restrictive finding of RFC that limited Carver to sedentary work.  (*Id*. at 25.)  This finding acknowledges the severity of Carver's physical impairments, and is well-supported by the record evidence cited by the ALJ.  Although Carver cites evidence that could support a more restrictive finding, it is not the role of this Court to re-weigh the evidence where the ALJ had adequately supported her decision.   The findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  In this case, the ALJ clearly articulated her reasons for finding Carver capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence.  Therefore, this assignment of error is without merit.

**2.        The ALJ considered obesity in combination with Carver's other impairments**

SSR 02-1p directs the ALJ to assess the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." SSR 02-1p at 6, *see also Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015). It acknowledges

---

[10]  The ALJ defined pain at a 10/10 intensity as "pain so severe you'd have to go to the hospital."(Tr. 52.)

that obesity may increase the severity of other limitations, and directs that the ALJ "will explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations." SSR 02-1p at 6. The regulation "does not identify a specific method of analysis," but does provide "detailed interpretive guidelines." *Norman v. Astrue,* 694 F. Supp. 2d 738, 748-49 (N.D. Ohio 2010).

It is undisputed that ALJ in this case acknowledged Carver's obesity at Step Four of her analysis, and referenced SSR 02-1p.  (Doc. No. 12 at 16; Doc. No. 14 at 12; Tr. 18.)  First, the ALJ found that Carver's obesity constituted a severe impairment — thus acknowledging that it significantly limited her ability to perform basic work activities. (Tr. 18, citing SSR 85-28.)  Next, she acknowledged that obesity can increase the effects of other impairments, and that Carver had level III obesity.  (*Id.*, citing SSR 02-1p.)  Finally, the ALJ stated that she considered Carver's obesity when evaluating whether she met or equaled any listing and when evaluating disability. (*Id.*)

The ALJ did not directly address Carver's obesity at the subsequent steps of her analysis. However, without expressly linking it to her obesity, the ALJ also discussed Carver's report of abdominal pain, which was effectively treated with Tums and antacids, in her Step Five analysis. (*Id.* at 24.)  Moreover, Carver does not point to any evidence explaining the interaction of obesity with her back pain that the ALJ overlooked.  As the Ruling itself states:

> we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

SSR 02-1p, 2002 WL 34686281 at *6.

Thus, the Ruling itself forbade the ALJ from making assumptions about the impact of Carver's obesity on her other impairments.  Other District Courts in this Circuit have declined to

remand under S.S.R. 02  1p even where an ALJ failed to identify obesity as a severe impairment, where claimant did not carry her "burden of marshaling competent medical opinion and evidence to show specifically how her obesity exacerbated her other impairments, or interacted with them, to render her incapable of all suitable work." *Smith v. Astrue*, 639 F. Supp. 2d 836, 846 (W.D. Mich. 2009). *See also Essary v. Comm'r* Soc. Sec., 114 F. App'x. 662, 667 (6th Cir. 2004) ("The absence of further elaboration on the issue of obesity likely stems from the fact that [plaintiff] failed to present evidence of any functional limitations resulting specifically from her obesity."); *Thacker v. Comm'r of Soc. Sec.,* No. 3:12CV1869, 2013 WL 5565869, at *4  5 (N.D. Ohio Sept. 30, 2013) (plaintiff must present evidence of functional limitation resulting from obesity, including how it compounds other impairments).  Here, the records cited note the fact of her obesity, but do not identify it as a complicating or exacerbating issue.[11]  Therefore, the ALJ adequately addressed Carver's obesity in her decision, and this assignment of error is without merit.

**3.      The ALJ considered diabetes in combination with Carver's other impairments**

Next, Carver argues the ALJ erred by failing to consider her diabetes in combination with her obesity and back surgery. (Doc. No. 12 at 17.) Again, however, Carver acknowledges that the ALJ recognized her diabetes as a severe impairment at Step Three, stated that she considered Carver's diabetes in combination with her other impairments in determining whether or not she met

---

[11]  Instead, the records of her first back surgery document that although Carver "was markedly overweight at 230 pounds and only 5 feet 3 inches tall . . . . exposure was fine and there was minimal bleeding. . . . I do not think that her overweight state . . . will prevent a good result."  (Tr. 526.)  The records of the second back surgery state "the patient was quite large therefore the opening had to be larger to order to visualize both the L4-L5 bodies and of course the upper part of the sacrum.  The vascular surgeon made a fine opening and ultimately we accomplished our goal. . . . I anticipate that she now has an excellent chance to be markedly improved."  (Tr. 531.)

26

or equaled any listed impairments, and went on to discuss her diabetes related-medical records. (*Id.* at 17; Tr. 19-25.)

Social Security Ruling 14-2p "provides information about the types of impairments and limitations that result from diabetes mellitus" and "provides guidance" as to how to evaluate disability claims arising from diabetes mellitus. *Weiland v. Berryhill*, No. 1:17-CV-727, 2018 WL 1750461, at *22 (N.D. Ohio Feb. 28, 2018) (quoting SRR 14-2p). Significantly, "there is no requirement that this particular Social Security Ruling be specifically cited in conducting an analysis that follows its guidance." *Dodson v. Comm'r of Soc. Sec.*, No. 5:18-CV-02263, 2019 WL 6841771, at *2 (N.D. Ohio Dec. 16, 2019). Carver testified that she tests her blood sugar in the morning and then once or twice more during the day, and feels her diabetes is well controlled now, although it was not earlier. (Tr. 54-55.) Her medical records describe her diabetes as "without complication" and "not uncontrolled." (*Id.* at 453, 459, 462, 466, 471.) Further, she fails to identify in what way diabetes interacted with her obesity and back surgery to preclude sedentary work. Therefore, the ALJ adequately addressed Carver's diabetes in her decision, and this assignment of error is without merit.

**4.     Assessment of Opinion Evidence from Vocational Counselor Cannelongo**

Carver also asserts that the ALJ erred by failing to properly weight the June 2014 opinion provided by Vocational Counselor Joseph Cannelongo. (Doc. No 12 at 17-18.) This assessment included summaries of medical examinations from 2012 and 2013, which were not included in the record. (*Id.* at 18.)

The Respondent asserts that the ALJ appropriately weighed Cannelongo's opinion. (Doc. No 14 at 18.) He explains that this opinion was not entitled to any deference because it addressed whether Carver was disabled, which is a conclusion reserved to the Commissioner, and Cannelongo

27

was not an acceptable medical source but rather an "other source." (*Id*.)  Respondent further explains that, as the ALJ also noted, Cannelongo's opinion was provided in a workers compensation context, which has different standards from those under the Act. (*Id*.)  Finally, the Respondent explains that the ALJ also chose to reject the opinion because it was not clear whether the opinion applied only as to Carver's ability to return to her past work, or whether it applied more broadly.  (*Id*.)

Under Social Security Regulations, a physical therapist is not an "acceptable medical source" entitled to the type of "controlling weight" an "acceptable medical source" enjoys.  *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f).[12]  However, the regulations also provide these opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c).  The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning." 20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03[13] further explains how opinion evidence from "other sources" should be treated.  SSR 06-03p provides information from "other sources" (such as a social worker) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939 at *2-3 (August 9, 2006).

---

[12]      For claims filed prior to March 27, 2017.  *See* 20 C.F.R. §§ 416.902(a)(7). Carver's claim was filed on September 25, 2014.  (Tr. 78.)

[13]      The Court notes SSR 06-03p was rescinded on March 27, 2017.  This rescission is effective for claims filed on or after March 27, 2017.  SSR 96-2p, 2017 WL 3928298 at *1.

Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also Williams v. Colvin,* 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017).

In this case, the ALJ addressed Cannelongo's opinion as follows:

> In an employability assessment, completed in June 2018, Joseph Cannelongo, M.S., opined that the claimant's "impairments as a result of her April 9, 2003 injury render her unable to be employed in any capacity for which she is otherwise qualified by education, training and/or experience." Statements that a claimant is "disabled," "unable to work," "Cannot perform a past job," "meets a Listing," or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate his statutory responsibility to determine the ultimate issue of disability. Furthermore, Joseph Cannelongo is not an "acceptable medical source." The employability assessment was created in the context of a Worker's Compensation claim, which has different standards than Social Security. Although Joseph Cannelongo stated that the claimant is unable to be employed, it is not clear whether he was familiar with the definition of "disability" contained in the social security regulations. Specifically, it is possible he was referring solely to an inability to perform claimant's past work, which is consistent with the conclusions reached in this decision.

(Tr. 25.)

The ALJ clearly explained the basis for his treatment of Cannelongo's opinion. Further, because much of the evidence underlying his opinion is not in the record, it was impossible for the

29

ALJ to meaningfully compare Cannelongo's evaluation of the evidence with her own.[14]  As the Sixth Circuit has explained, Ohio's Workers' Compensation system has a different, less restrictive definition of disability than the Agency: "the Ohio workers' compensation statute defines as 'a disability which prevents a worker from returning to [the worker's] former position of employment.'. . . disability for social-security-disability-benefits purposes is a much higher standard than disability for Ohio workers' compensation purposes." *Bayes v. Comm'r of Soc. Sec.*, 757 F. App'x 436, 444 (6th Cir. 2018), citing *State ex rel. Crim v. Ohio Bur. of Workers' Comp.*, 751 N.E.2d 990, 993 (2001) (referring to Ohio R.C. § 4123.56).  The ALJ's explanation for why conclusory statements from a vocational counselor in a Workers' Compensation case were not compelling evidence in the context of a Social Security claim involves neither legal nor factual error, and is not grounds for remand.[15]

---

[14]  To the extent Carver is challenging the ALJ's decision not to give weight to medical opinion that were referenced in Cannelongo's opinion but not included in the record, the Court notes that, absent special circumstances, "the claimant bears the ultimate burden of proving disability," and thus the burden of producing this evidence was on Carver. *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008).  No "special circumstances" are present in this case.

[15] In her Brief on the Merits, Carver asserts that the ALJ erred by stating that Cannelongo was not an acceptable medical source, although she identifies Cannelongo as a "Vocational Expert," with no medical training.  (Doc. No. 12 at 18.)  In her Reply, she equates Cannelongo's opinion with a Functional Capacity Assessment signed by a claimant's treating physician.  (Doc. No. 15 at 3, *citing Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546 (6th Cir. 2020).)   The Regulations clearly establish different procedures for addressing opinions from acceptable medical sources who treat claimants, and opinions from other professionals who may treat or assist claimants, but are not acceptable medical sources.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (describing a "treating source" as "a medical source who regularly treats the claimant").  Therefore, it is inaccurate to assert, as Carver does, that the *Hargett* court's conclusion that "ALJ improperly disregarded an FCE [is] an analogous finding to the ignoring of this vocational assessment."  (Doc. No. 5 at 3.)

30

**5.** **Opinions of the State Agency consultants and reviewers**

Next, Carver asserts that the ALJ erred by giving only "some weight" to the opinions of the State Agency reviewing physicians. (Doc. No. 12 at 20.) The Court notes that the reviewers opined that Carver could lift and carry at the light level of exertion. (Tr. 89-91, 121-23.) The ALJ found greater limitations, restricting Carver to sedentary work. Therefore, any error is harmless.

Carver restates the findings of the second State Agency reviewing psychologist who opined that she had moderate mental functioning limitations. (Doc. No. 12 at 20.) She asserts that it was error to give this opinion only "some weight," but fails to explain how the mental functioning restrictions that the ALJ included in Carver's RFC are inadequate.[16]

As the Respondent points out, there is no medical record or opinion evidence supporting the assertion that Carver was more limited than the ALJ found. (Doc. No. 14 at 18.) The ALJ properly based her determination of Carver's visual impairment on uncontested opinions are the only medical opinions in the record, and therefore this RFC finding should be affirmed. *See Ortman v. Comm'r of Soc. Sec.*, No. 2:14-CV-1900, 2016 WL 2595111, at *2 (S.D. Ohio May 5, 2016) ("[S]ignificantly, the record contains no medical opinion of greater limitations than those that the

---

[16] These restrictions accommodate the limitations to concentration and pace found by Dr. Matyi, and include that Carver is "capable of understanding, remembering, and carrying out simple tasks that are not fast paced meaning the pace of productivity is not dictated by an external source over which the individual has no control; . . . can tolerate frequent interaction with coworkers, supervisors, and the public; but should have no responsibility for conflict resolution or persuading others; and the work routine should be repetitive from day to day with few and expected changes." (Tr. 21.) Restating the conclusions of the reviewing psychologist does not constitute a coherent argument. The failure to identify inadequacies in the ALJ's mental functional limitations waives this argument. *See McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

administrative law judge included in her RFC determination").

**B.      Second Assignment of Error: Determination of Credibility**

Next, Carver asserts that the ALJ did not properly evaluate the medical evidence and make a defensible determination as to whether Carver's testimony was credible, describing the ALJ's "analysis that Carver was not credible" as "contrary to her statements in the body of the decision." (Doc. No. 12 at 23.)  She cites as evidence of this that the ALJ found Carver's statements were not entirely consistent with the medical evidence in this matter, yet she accorded the opinion of Carver's husband some weight as his opinion was "somewhat consistent with the record as a whole," asserting that Carver and her husband made substantially similar statements.  (Doc. No. 23.)

The Respondent notes that the ALJ cited specific medical record evidence that contradicted the "extreme limitations" in Carver's subjective report.  (Doc. No. 14 at 20.)  Further, the ALJ incorporated some of Carver's testimony as well as the report from her husband in her decision to make a determination of RFC that was more restrictive than that offered by the State Agency reviewers.  (*Id*. at 21.)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms.  *See e.g, Moore v. Comm'r of Soc. Sec.,* 573 F. App'x 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, No. 09 6527, 2011 WL 383254 at *3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's]

32

capacity for work" 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[17] 2016 WL 1119029 (March 16, 2016).

If the claimant's allegations are not substantiated by the medical record, the ALJ must evaluate the claimant's statements based on the entire case record. The evaluation of a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms" SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").

In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider.[18] The

---

[17]SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the May 9, 2017 hearing.

[18]     The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used

ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Carver's complaints of pain that prevented her from being able to sit or walk for more than five minutes, stand for more than one minute, limited her ability to bend, grip, or reach, and made her unable to lift more than five pounds, as well as mental health impairments that caused panic attacks ten times a month, and a visual impairment that caused her to have no depth perception. (Tr. 22.) After discussing the medical and opinion evidence at length, the ALJ found Carver's medically determinable impairments could reasonably be expected to cause her alleged symptoms; "however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id*. at 26.)

The ALJ supported this determination with sufficient evidence. Specifically, the ALJ found that Carver "described daily activities that are not limited to the extent one would expect given the complaints of disabling symptoms and limitations. The claimant is apparently able to care for her husband when he was ill, without any particular assistance, which can be quite demanding both physically and emotionally. . . . The record also reveals that the treatment has generally been effective in controlling these symptoms." (*Id*.) She noted that, despite Carver's vision problems, the opthamalogical consultant had found Carver able to drive, she had passed a test for daytime driving, and Carver testified that she drove short distances regularly. (*Id*. at 24-25.) She also noted medical

---

to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7.

records showing Carver had "no gait deficits, she could do fine and gross manipulations, and 'she responds well to treatment, but the relief is temporary,'" as well as reports from her psychological care providers that "her moods have been in check.  She has not had excessive anxiety or panic attacks."  (*Id*. at 24.)

Assuming, *arguendo*, that Carver and her husband made identical statements, there is no contradiction inherent in finding Carver's statements "not entirely consistent with the record" and her husband's statements "somewhat consistent with the record as a whole."  (Tr. 26.)  Further, the ALJ's RFC is consistent with these statements, as the RFC accommodated many of Carver's subjective reports of her functional limitations.  For example, the RFC accommodated Carver's complaint that she could not sit comfortably for long periods by including in her RFC finding the option to stand up approximately every fifteen minutes for one to two minutes, which is the amount of time Carver reported she could stand.[19]  (Tr. 21.)  And Carver reported waiting, presumably in either a sitting or standing position, for as long as "an hour or over an hour to get one of those motorized carts" to do her shopping.  (*Id*. at 60.)  Further, as Respondent points out,  the standard for disability is not what an individual can do comfortably or without any pain.  *See Carr v. Comm'r of Soc. Sec.*, No. 1:16-CV-01249, 2017 WL 9485651, at *10 (N.D. Ohio May 22, 2017) ("The RFC is the most you can do, not what is the best or ideal environment.").

It is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds*

---

[19]  In both her Brief on the Merits and her Reply, Carver reiterates that the ALJ noted she was having trouble sitting during the hearing.  (Doc. No. 12 at 24; Doc. No. 15 at 3.) This is true, however, the ALJ not only acknowledged this impairment, but accommodated it in her determination of RFC, which provided for the option to stand up approximately every fifteen minutes for one to two minutes.

*v. Comm'r of Soc. Sec.*, No. 09 2060, 2011 WL 1228165 at *2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at *6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") The ALJ provided sufficiently specific reasons for her evaluation of Carver's subjective symptoms and supported those reasons with reference to specific evidence in the record. Carver's argument to the contrary is without merit.

### C.      Third Assignment of Error: Step Five

Finally, Carver asserts that the ALJ erred by failing to consider the cumulative evidence which supported a finding that she would be "off task and/or miss[] more than one day of work per month." (Doc. No. 12 at 24.) She also asserts that the ALJ's analysis at Step Five failed to address impairment in her depth perception due to her documented blindness in one eye, and failed to account for the VE's statement that "if a person had a variable pace and was not producing the same as an average worker, employability would be problematic." (*Id*.)

The Respondent asserts that Carver failed to provide any evidence or argumentation supporting the assertion that she would be off task "and/or" miss more than one day of work per month. (Doc. No. 14 at 24.) He argues that the ALJ's RFC finding and hypothetical were supported by substantial evidence, and the ALJ properly relied on the testimony of the VE that a hypothetical individual with Carver's background and the RFC finding could perform a significant number of jobs in the national economy. (*Id*. at 24-25.)

It is undisputed that the VE testified at the hearing that jobs were available in the national economy for a hypothetical individual with Carver's vocational background and education, and who

36

had the same functional limitations provided in Carver's RFC. (*Id*. at 67-70.) The ALJ reasonably relied on this testimony in finding Carver remained capable of performing a significant number of jobs available in the national economy at step five. (*Id*. at 27.) As the Sixth Circuit has made clear, a VE's testimony "may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments." *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001).

Any argument that the ALJ should have found Carver would be off task "and/or" miss more than one day of work per month should be deemed waived, due to the perfunctory manner in which it was raised. *Kuhn v. Washtenaw Cnty*., 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived"). Further, as discussed in section VI.A.5 and B *supra*, the ALJ appropriately accommodated the mental limitations recommended by the Dr. Matyi in her RFC, and supported her RFC determination with substantial evidence.

Similarly, Carver's argument that the ALJ should have added a limitation relating to lack of depth perception has no support in the medical record. (Doc. No. 12 at 24.) Consultative opthamologist Dr. Schild opined that, due to blindness in her left eye, Carver should not be in hazardous environments but could drive. (Tr. 493.) The ALJ found Dr. Schild's opinion was consistent with the evidence, but further restricted Plaintiff to never climbing ladders, ropes, or scaffolds and to no jobs requiring binocular vision. (Tr. 21, 25.) Carver does not offer any evidence other than her own testimony in support of this restriction, and the ALJ provided substantial evidence for the visual limitations she adopted.

Because the ALJ did not err in making her determination of RFC, she properly relied on the

VE's response to they hypothetical based on that RFC.  *See, e.g., Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir. 2004); *Walker v. Astrue,* No. 3:11-cv-142, 2012 WL 3187862 at *6 (S.D. Ohio Aug. 3, 2012) (report and recommendation adopted by *Walker v. Astrue*, No. 3:11-cv-142, 2012 WL 3755606 (S.D. Ohio Aug. 29, 2012)).

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 5, 2020

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**